22 30 94 St. John v. Emigrant Mortgage Company. Good morning, Your Honor. Matthew Schwartz on behalf of Emigrant. Despite the attempts by plaintiffs and their amici to turn this case into a referendum on the housing discrimination laws, this appeal is about the specific errors that the district court made below and nothing more. Emigrant fully supports the housing discrimination laws and a victory here for Emigrant would not undermine them in any way. We simply want those laws applied as written and as Indeed, the district court committed several errors that allow the plaintiffs to bring untimely claims and to allow the jury to reach its verdict based on what the jury thought about the terms of the loans and not what the jury thought about racial discrimination. First, it's undisputed that the plaintiffs brought their challenge more than three years after they discovered the supposed injuries, which at the latest was when they were told by Emigrant that they needed to pay higher interest rates on their Emigrant loans after they faulted on them. Each plaintiff testified that they suffered payment shock because these amounts were more than they were led to believe and more than they were told they would have to pay. At that point, when the plaintiffs believes that they at that point, they might have known or should have known that it was a bad loan, but they they didn't have reason to know that it was a discriminatory loan. So, Your Honor, I think that gets to the nub of the issue, but it's not a bad loan, right? You can go in and get bad terms because you agree that you agree to terms that may be higher than the market rate or whatever it is. They testified they were defrauded, right? That they were that they now had to pay more than they were told that they had to pay. And at that point, they knew that they had an injury and they had an obligation to investigate that injury and talk to counsel in a timely manner, and they didn't do so. And that is why the statute of limitations... How did they know that they had been defrauded when they signed the loan papers? The comparison is to an employment situation. You get fired, you know you've been fired, and that's something bad has happened. When you are getting a loan, you're getting some money. You're getting a loan. You don't think that this is something bad happening to you. Sure, Your Honor, I understand that, and I think let's put aside for the fact that I think the case law is very clear that the statute of limitations starts to run when the act of discrimination occurs, which in this case is allegedly when the mortgage happened. I understand the court might not want to fully embrace that in these circumstances, even though I think in order to toll or to add a discovery rule, you would have had to have factual findings below. But to address your specific question... Can I just ask a clarification on that? Yes. Are you saying when it was signed or when it was foreclosed? I think under the case law it was signed, but I understand that's when statute starts to run under the case law. But I understand that you might not want to embrace that type of rule of law. I think it's very easy in this situation to write a much narrower opinion. Each of the claimants testified that they suffered payment shock. They testified later that their signatures were forged, that they were watched through the process, they were lied to about the rates that they would have to pay, and counsel summarized the payment shock repeatedly over and over again. Once that happens, once you believe that you've been defrauded, you've been in breach of contract, at a minimum, even if you don't know there's... Is there going to be a fraud claim accrues? But does a discrimination claim accrue at that time? Absolutely, Your Honor. All the claims that arise out of that factual basis accrue at that particular time. And I think that's key. But what's just as key here is there were no findings of fact by the district court whatsoever to support the district court's view that the discovery rule applied or that equitable tolling occurred. Well, if you're saying that the fraud is in play, then why wouldn't the discovery rule be appropriate? I agree completely, Your Honor, that once you learn that you're defrauded, then you've discovered your claims and you have the obligation to go and investigate those claims and talk to counsel. And each of these plaintiffs, that's exactly what they ultimately did several years later in an untimely fashion. And once they talked to counsel, they decided that they were going to bring discrimination claims. So, and I understand you're, at least for the sake of argument, conceding, okay, maybe you get discovery rule or equitable tolling, something that postpones it from the date of the closing. But by the time they got the shock, what you're calling the shock of the default rates being much higher than they knew, the clock had to have started there. There's no doctrine that gets them beyond that. And they had more than three years. Putting aside the discovery rule and the accrual, one of the things I'm sort of struggling with is, you know, we talk about fraudulent concealment, we talk about equitable tolling. There's a little bit of overlap in the case law. I think we've tried to, I think I've got it sort of sorted out. And it seems like equitable tolling is a doctrine that says, A, you've got to have due diligence so we can argue about whether there was due diligence here. And B, you have to have some sort of extraordinary situation that would make it impossible or very, very, very difficult to timely pursue your claim. And I guess putting aside the due diligence for a second, why isn't a sort of disparate impact discrimination theory exactly the kind of theory that no individual could possibly ascertain in the moment of their own individual foreclosure until they learn of the sort of collective data that drives the disparate impact claim? So that's a very good question, Your Honor. I think that question, though, applies across all discrimination claims, including employment, where in many situations you would need data to show that there was a disparate pattern as to employment. And yet the courts are very clear that the statute of limitations starts running at the moment that you actually have the discrimination. What Your Honor's question just asked kind of goes towards the district court's view that as a matter of law, all disparate impact claims and all racial discrimination claims in housing are inherently concealing. And that's completely contrary to what this court has said, which sets forth a standard of elements that the district court is supposed to make factual findings on after a hearing to figure out in that particular circumstance whether or not equitable tolling should apply. None of that happened here. And what we think is very clear is once they had this payment shock of the default, an emigrant continued to say, you owe 18% on your default. Come work with us. We'll try to work this out, and kept saying that. Nothing emigrant did concealed their claims. There was nothing preventing them from going to a lawyer at that particular moment. And if they had gone to a lawyer at that particular moment, counsel very ably would have advised them. Well, again, I want to distinguish fraudulent concealment, which I understand to be a type of equitable tolling, but not the only type, right, from equitable tolling more broadly. And I take your point about discrimination claims, but I guess I'm wondering whether there's a distinction between discrimination that's based on a disparate impact theory, which necessarily requires macro data, versus discrimination based on specific evidence in your case. I don't think so, Your Honor. First of all, in the employment context, again, it's always been at the time of the actual action, the discriminatory act that's been taking place. And there are certainly circumstances where the employment discrimination is clear, and there are certain circumstances where it's disparate. And the courts haven't distinguished between those in terms of equitable tolling. In this circumstance, again, Your Honor, I agree that some claims are more difficult to understand and to discover than other claims. What the court and the Supreme Court has made very clear is that the claims, the discovery period starts from the time of the actual injury, from when the plaintiffs learned the injury and they learned the cause. I understand that they argue that there are different types of injuries that occurred here. But it's very clear based on the testimony that once the plaintiffs thought that they had to pay a default interest rate that they never agreed to, that was injury. And they understood the cause was emigrant in that situation from their view. That's partly why I'm focusing on the equitable tolling question, because I understand our case law about discovery and injury. But I don't see that same, I don't see those same principles in our equitable tolling cases. I don't see equitable tolling cases that say, once you knew of your injury, there's no opportunity for equitable tolling, even if you couldn't have discovered your cause of action with reasonable diligence, and undertook the reasonable diligence. Okay, so I understand that. I would make a few points here. First of all, again, nothing emigrant did stop them. Second of all, had they been diligent as is required under equitable tolling, once they thought they were defrauded, they would have immediately gone to see a lawyer or immediately gone to investigate their claims. Had they done so, they would have maybe brought their claims in a timely manner, because once they did speak to counsel, they did bring those claims within the two or three statute of limitations. So I don't think equitable tolling applies here. It certainly doesn't apply as a matter of law, like the district court found. And I understand there are going to be some disputes- There are a number of district court cases in the lending area that apply these concepts. They're just wrongly decided, or what? I think there are a couple that go too far and don't follow this court's rulings. But in the main, they are either done at the pleading stage, or they are done because there was some specific concealing action that the lender took. And if you look at many of these cases, it's about the same lender or the same homebuilder. And in those situations, the specific finding of the district court, either at the fact stage or the acceptance of the allegation at the pleading stage, was that the borrower- You're about to run out of time, by the way. Do you have other points you want to make? Well, I'm happy to talk about whatever the court wants, but it was that the borrowers were steered to lawyers that they thought were their lawyers but were not, and so the claims were concealed in those situations. That's not what happened here, and there certainly was no finding of fact by the district court that that happened here. So we think that this decision should be reversed on the statute of limitations grounds alone. At a minimum, if the court has concerns, it should be vacated for findings below. I certainly do want to talk about the jury instructions. There are two main issues. The first is obviously the disparate impact. We think that the Supreme Court couldn't have possibly been clearer in its inclusive communities decision that disparate impact requires disproportionality in terms of the way that the policy affected different groups. The district court here struck that language that even the plaintiffs wanted and that the model jury instructions require, and so it didn't require any disproportionality all around. Well, I certainly agree it would have been better if the district court had left those words in, but if you look at it as a whole, the charge as a whole, there are references to disproportionality, race, color, national origin is stated maybe 20 times. Why wasn't it adequate when you look at it as a whole? So the words disproportionate appear 23 pages before the actual charge on the particular account that they wanted, and if you look at the actual charge that the judge gave, it allowed the jury to find discrimination based on, one, if they disliked the loans, the loans were adverse, and two, if the loans had an adverse effect on African-Americans, with no question about disproportionality as opposed to other groups. Plaintiff's own expert testified on the stand that the loans were not- I think that these are the defendant's request of charge, and the request was significantly adverse or disproportionate impact on black borrowers. So you have that in there, but as an or, I don't know that it makes a whole lot of difference if you have the or in there. I think it does, Your Honor, because if you look at our proposed instructions as a whole, and certainly our objections throughout, we wanted to make clear to the jury that it can't just be bad for black borrowers. It has to be bad for them disproportionately as opposed to other borrowers who are out there. And their own expert testified on the stand that these loans were not disproportionately bad for African-Americans. That should be more than enough to question whether or not a disparate impact verdict would have been valid had the judge given proper instructions here. You haven't made a sufficiency argument on this appeal. It's more about the instruction. There is lots of evidence of targeting minority communities. Well, first of all, that evidence is obviously hotly debated and disputed below. But given the jury's verdict, we can show the evidence in favor of the winning side. But only if the jury had been properly instructed. So you have no idea what the jury found, whether the jury thought there was actual targeting, because the district court instruction specifically didn't require that. Just very briefly on treatment, we believe that specifically telling the jury that animus was not required was a hundred and- That's taken out of context, because he defines animus to mean hatred, or I forget the exact words. It wasn't just that you don't need animus. You don't need animus meaning, I forget the exact words. It was defining animus to be hatred and something else. That's correct, Your Honor. But this court, and Judge Robinson mentioned the word four times on the prior argument that we had, it is a requirement here. And what he did was he said- And I think animus is certainly a requirement in the sense that race has to be a motivating factor. But you don't need to prove hatred, do you? What you need to prove is that race was somehow improperly used in a way that was negative or discriminatory towards the group. These loans are incredibly troubling. I mean there was the Howell. Howell, his house was worth $430,000. He only owed $6,000. He had $424,000 in equity. Emigrant gives him a loan at 10 percent and with a default rate of 18 percent. In the end, the house was foreclosed. And even though he had $424,000 in equity, he gets not a nickel. And he's lost the house. That's troubling. So, Your Honor, a couple of things. I think the question Your Honor asked makes the exact point that we have on our side here. Which is the jury instructions here allowed the jury to reach its verdict based on its views about whether or not it liked the loans. Not whether or not there was racial discrimination that was involved. It's exactly the point that we've been making the entire time. They constantly were allowed to use the word predatory. They constantly focused on the terms of the loans. Is that not a predatory loan? A loan that's designed to strip homeowners of their equity? Your Honor, that's not what the loan was designed for. Each of these homeowners- There certainly was lots of evidence to that effect. So, Your Honor, we disagree strongly with that. Each of these borrowers was in debt. Some of them had tens of thousands of water or electricity bills. They had divorce decrees in Mr. Howell's situation that he needed to pay. These were loans that they needed to take out or they were about to default and have their homes foreclosed on in other places. Knowing all of that, Emigrant made the loans to them anyway, knowing that they weren't going to be able to pay because of their credit situation. Isn't that so? So, Your Honor, I think what Your Honor's questions are are exactly the point that we're making in this case. That if Your Honor had been sitting there as a juror, you might have thought very strongly about the terms of the loan. And if you were given faulty jury instructions that did not require that these loans be disproportionately bad for black borrowers as opposed to non-black borrowers, you might very well have reached the verdict that the jury did so below. But these are discrimination claims, Your Honor. They are not about the terms of the loans. That's a different case that's for different people. That's not what was alleged here. And that's what the judge allowed to have happen. And that's why these instructions are so problematic. Okay. Thank you, Counselor. You've preserved some time for rebuttal. May it please the Court. Lila Miller for the Plaintiff's Appellees, some of whom are with us today. I will turn to timeliness in just a moment, but the product at issue is important, so I'd like to say just two sentences on it. Before the Starnian loan was regulated out of existence, it was defined by a lack of front-end underwriting, low credit scores, and an interest rate that rocketed to 18% for even a single missed payment. These loans failed half the time, but they were highly profitable for emigrant because they required borrowers to have a lot of equity in their homes. In 2016, a jury found discrimination, but the predicate facts were not known to the plaintiffs during the statutory period. And I want to pick up where opposing counsel left off, which is that these are discrimination claims, not fraud claims. Emigrant has not demonstrated that the district court's application rose to the level of an abuse of discretion, and the record confirms that it was, in fact, the correct result here. If they're not fraud claims, then doesn't that make importing the discovery rule a little bit of a novel ask of us? Not quite, Your Honor. What the discovery rule looks at is when a plaintiff learns of the particular injury. All of the cases that opposing counsel has cited for the discovery rule are when the plaintiff discovers the injury that was subsequently pled. And here we have to look at when plaintiffs discover discrimination specifically. But I'd actually like to turn to equitable tolling, because I think that is a straighter shot to affirmance here. Can I, I do want to pick up on something you just said, though. You said the injury, and you equated injury with essentially what I would call the cause of action. So in the damages claim for the discrimination, is the measure of damages something that accounts for the emotional toll of being the subject of discrimination, or is the measure of damages that you'd be seeking related to the financial loss arising from these predatory loans? Both were at issue here, and that first part that Your Honor mentioned, the emotional distress or the dignity harms of discrimination are part of what's at issue when you are a victim of discrimination. That is a separate injury that this court has recognized repeatedly stands alone. And in fact, we have that for some of the plaintiffs here. Four plaintiffs following the second trial have nominal damages in recognition of the fact that they were victims of discrimination specifically, not that they were defrauded. So when did the claim accrue then? I think your friend said signing or maybe foreclosure. What's your answer to that? The first time that any plaintiff had notice inquiry of race discrimination claims was when Mrs. St. Jean appeared in foreclosure court in May 2009. This would be a novel holding, wouldn't it, to apply a discovery rule in this context? There are no decisions going either direction in this particular kind of case at the circuit level. Your Honor is correct about that. What about Garcia in the Ninth Circuit? Did that say that discovery rule doesn't apply to FHA? That's a design and construction case, Your Honor, where the plaintiff at issue did not even encounter the defendant or the inaccessible building until years after it was built. Here the plaintiffs had been sort of locked in or ensnared by an immigrant earlier. They just did not discover the race discrimination perpetrated against them specifically. So Garcia is a completely different context of the Fair Housing Act. As I understand it, in securities fraud context, there's a statute of repose, which in five years means the clock ends. Here, I think what you're asking us to say is that in discrimination cases, where in the FHA I understand there is not such a time limitation, the discovery rule would allow claims really at any point from discovery, I guess. Not at all. And I think for the employment discrimination cases that have come up so far, it is important to note that courts have looked at when plaintiffs learned of the predicate facts that were at issue for the injury. So in all of the employment discrimination cases that have been cited, the plaintiff knew everything at the time of the adverse action. That is not what happened here. And we think any decision by this court affirming could be narrow and based on the facts at issue, which is also true for equitable tolling, Your Honors, if I may address that doctrine. According to this court, equitable tolling is available in fairness when a plaintiff was somehow prevented of learning of her cause of action within the statutory period, regardless of fraud or concealment. And on this point, we know, Your Honors, do not have to reach through a cruel question in order to affirm equitable tolling here. The undisputed record evidence shows that no plaintiff knew of or suspected race discrimination specifically, either at the closing table or when the default interest rate was imposed. The record also shows, and here we have a six-week trial record as opposed to a single-day evidentiary hearing. We have vigorous cross-examination at trial. We know that no plaintiff knew any other borrowers, and emigrant has presented no evidence that showed they could have discovered race discrimination specifically, even all of the evidentiary points opposing. There's evidence that they knew something bad was going on. Signatures were purportedly forged. Why isn't that enough? I'm aware of no case, and emigrant has cited none, where if something bad happens to a member of a protected class, they are then obligated- When I say bad, they knew they suffered injury at that point. There's no evidence in the record showing that they could have discovered it had to do with race, and it was not meeting with counsel that revealed plaintiff's claims. It was when a plaintiff went to foreclosure- I guess that's the issue. Assume they didn't know at that point that it was related to race. Why weren't they put on notice that they should go consult with a lawyer because clearly something bad was happening that was hurting them? Three things, Your Honor. The first is in the other district court cases that have addressed this, even when a plaintiff has consulted with counsel, for instance, for bankruptcy, a court has said that does not necessarily mean that you are going to know about race discrimination. Investigating fraud or preventing a foreclosure is not necessarily the same as understanding that you have a disparate impact or a discrimination claim. The second is that there are plenty of terrible products out there that have nothing to do with race, and so the fact that you've got one does not mean that you are alerted to race discrimination. Diligence is a requirement in equitable tolling. What was the evidence here that the plaintiffs- of their diligence? The evidence, Your Honor, is that within two years of learning of race discrimination specifically, all of them filed their claims. There's no dispute there. I mean, that's assuming- that sounds backwards. I mean, I think this is the same question that she was asking. At what point did- I don't understand when the clock is starting, I guess. And I think for equitable tolling, there doesn't need to be a moment that the clock starts. I think the accrual question- The injury or the harm that puts them on notice that they should investigate. The fact that put the plaintiffs on notice to investigate was the first time any of them had an indication that race played a role in their receipt of the Starnia loan product. Why is that right, though? I mean, I thought this was all about the loan product, the unfavorable terms and the harm that was caused by the foreclosure or the modification. No, Your Honor. This is a race discrimination case, and there was no mystery about that. It was emphasized throughout the trial that plaintiffs were there because they were black and Hispanic borrowers who were targeted because of their race. That was the injury that animates their claims, and it was the guiding principle at trial. Maybe can I ask a slightly different way? Take it out of the facts of this case. If we embrace the notion that equitable tolling applies in these disparate impact discrimination cases until you discover it, that seems like it's doing away with the notion of the statute of limitations, and your stopgap, stop against that is saying, no, you still have the diligence requirement. So what does due diligence look like once you've been subjected to, and I'm going to use the language of the predatory loan, and you realize you've been subjected to the predatory loan, what does due diligence look like, and when do you cease to be diligent? Is it a temporal thing? Yes, Your Honor. I'd like to address the diligence question, but just a step back on the question of discovering these claims. On different facts, we wouldn't be here, and I would refer the court to the 2014 decision in Clement where the home purchasers all lived on the same block and had gone to meetings with each other, and so they were on notice that race played a role and did not have timely claims, and in fact, the district court cases at issue here go both directions, as they should, because this is a fact-specific inquiry. If emigrant had done the closings in their branch offices, or if they had hosted information sessions for Star and Una borrowers, we might not be here today, or my job would be harder, but that is not the case. So even affirming here is just based on the facts and the record. And then as to diligence, Your Honor, I think the question is, once plaintiff realized that they were a victim of race discrimination, did they act diligently for the equitable tolling inquiry specifically? So until they have reason, I guess it's realized or should realize, right, or is put on notice of the possibility, do they have to actually conclude it's likely? Inquiry notice is a thread in this court's equitable tolling doctrine, and I would also say that if this court were to adopt emigrant's position that getting a bad deal provides inquiry notice of race discrimination specifically, that essentially creates a separate equitable tolling doctrine applicable only to members of a protected class that say, anytime something bad happens to a black borrower or a black consumer, you better file a discrimination claim because equitable tolling will be uniquely difficult for you to access, which is a perverse result for an equitable doctrine and remedial statutes. Okay, so just to go back, though, all right? So you say once they are on notice, maybe it's higher than that, but let's say at a minimum on notice of the possibility that they were subjected to discriminatory targeting, they have a duty to act quickly. So they have no duty when the bad thing happens, they can go about their life living the way they would ordinarily live unless and until they stumble upon this evidence of discrimination, and equitable tolling is preserving their cause of action through that. That could be a decade. Two things, Your Honor. Preserving it for discrimination. I don't think we would be here if this was a fraud claim, and only one plaintiff attempted to assert a Truth in Lending Act discrimination or Truth in Lending Act claim related to these loans. And the second thing here is that the court in Veltri addressed the issue of repose because I believe this comes up in every equitable tolling case, and it identified four things, whether the plaintiff actually had knowledge of the cause of action, whether the plaintiff reasonably should have had knowledge of the cause of action, whether the defendant had asserted an equitable defense like lashes or estoppel, and whether the plaintiff acted diligently. So this court has ensured that there are different ways of cabining the doctrine. I know I'm out of time, Your Honors, but if I may turn briefly to the discussion. Can I ask a follow-up question on that? Oh, sure. If we accept this theory, how does that apply to our title 7 jurisdiction? Is it different from the way equitable tolling would apply there? For equitable tolling, Your Honor? Yes. For equitable tolling, I believe— You're fired, and you don't necessarily know all the reasons why, but usually we say the clock starts, and then you have your diligence obligations from there. What you're saying is, no, if it was because of discrimination, your clock hasn't started, and maybe it's not until 10 years later when other people were fired for racial reasons. You read a news report about it, then the clock starts. Is that what we would have to endorse by adopting your theory? The title 7 cases that are out there in the circuit, Your Honor, have had a situation where the plaintiff had the predicate facts for their discrimination claim at the time. Their knowledge did not change between the adverse action and when they filed the case, although the statute of its limitations did lapse. Here we had knowledge of a new fact, which is seeing the other borrowers. I think a good example is the Miller case that's cited in Emigrant's Brief. There it was a lawyer who suspected age discrimination in promotion while he was employed, suspected age discrimination at the time of his termination, and then simply did not bring his claims in time. And the same is true of Morris and Malani, the other two cases that are cited by Emigrant. The plaintiffs all had the predicate facts at the time of the adverse action. What if you're fired, you don't know that it's because of race, and then three years later you learn of a comment? Like in our last case, you learn of a comment. Do you then get the benefit of that additional time because you didn't know until then that it was race in the employment context? You might, and you would have the burden of proving that your not knowing was reasonable under the circumstances. And that's what plaintiffs have demonstrated here. If I may, Your Honors, turn briefly to the disparate impact instruction. Briefly, go ahead. The court has to take the entire charge as a whole. And on the proportionality and the comparison front, this charge was correct as given. But to level set- You also asked for the disproportionate impact language, right? Yes, we did, Your Honor. But it is not the exclusive path to telling the jury about the prima facie disparate impact analysis. And if the court would permit, I'd be happy to walk through the four parts of the charge that adequately informed the jury of its task. But this court has to find- or emigrant has to show both defect and prejudice. And on this record, the wordsmithing they suggest simply would not have changed the outcome. If I could turn to the charge. Go ahead, Briefly. The court began by saying that plaintiffs claimed that emigrant made these loans disproportionately to communities of color. And that emigrant denied making these loans disproportionately to communities of color. It described the statutes at issue in this case later on in the instruction and said that they prohibit discrimination on the basis of race. And we have to credit the jury with a common understanding here, Your Honors, and that is differential treatment because of race. Then when teeing up the disparate impact claim, the court said plaintiffs can also prove that a particular practice had a discriminatory effect, a differential effect based on race. Then it went to give the substantive charge at issue, asking if plaintiffs had established an adverse impact on black and Hispanic borrowers. And even that language standing alone telegraphs the correct inquiry. Whether we look at Huntington Branch, you could cut and paste from that decision into this jury charge or the common sense inquiry. Which is if you read a headline that said data shows cigarettes are bad for women, you would understand it to mean uniquely or especially. A final point to wrap up, Your Honors, is that the St. Teal's waiver issue matters here. Because emigrant is still pursuing foreclosure actions against the St. Teal's and the St. Jean's. And a liability verdict of discrimination is an argument as to emigrant's unclean hands that they will be able to raise to attempt to save their homes. What happened? Weren't there some equitable claims at one point and Judge Johnson didn't reach them? Did they ever resurface? For the St. Teal's, Your Honor? Yeah. At issue right now, yeah, is just whether their 2010 modification was enforceable as a matter of law. I didn't know whether there was an open claim for injunctive relief. No, Your Honor. This will not be remanded for further proceedings if the court affirms on the St. Teal's waiver. But it is quite relevant to the foreclosure actions. Thank you, Counsel. Ms. Gordetsky. Good morning. Lauren Gordetsky on behalf of the CFPB. I'd like to briefly discuss equitable tolling before turning to the jury instructions. Now, in equitable tolling, there are two questions here. First is whether this scheme is of such a nature as to be inherently self-concealing. Or put another way, are the extraordinary circumstances present here that would warrant equitable tolling? And another question is whether, on the facts of this case, the district court properly exercised its discretion in applying equitable tolling here. Now, on the first question, district courts in this circuit and around the country have almost uniformly recognized that these cases are capable of being equitably tolled or are self-concealing without problem for the past, again, 20 years. And those decisions have come out multiple ways. Now, while the courts have recognized they're capable of being self-concealing, they haven't mechanically applied equitable tolling. They have required the plaintiffs on a fact-by-fact basis to demonstrate that it applies in those particular circumstances. Which brings me to the second point. In this particular case, the court was confronted with the factual circumstances of this case, compared it to other cases, and determined in its equity and acting at its discretion that equitable tolling applied here. And this is all consistent with what this court said in the Veltri v. Building Service case. In that case, this court recognized that a certain type of claim was capable of being self-concealing, but it was not adopting a mechanical rule that it would always apply. So it wasn't going to eviscerate the statute of limitations, but it recognized still that it was a decision grounded in equity that would depend on the cases, and defendants would still have all the defenses available to it on a particular case. Do you also agree with your friend that the clock started, whether there was tolling or not, from the time when plaintiffs realized or became aware or should have become aware that the loans were discriminatory? Well, if I understand your question, I want to break it into two parts. There's the question of when the statute of limitations starts tolling for purposes of, say, the discovery rule. But the equitable tolling analysis is slightly different. It's regardless of when the statute of limitations starts tolling, are there circumstances that warrant extending that in a matter of fairness? Well, the reason I phrased it the way I did or tried to is that there's a diligence requirement, right? And so I'm asking, I guess, whether that started when the bad thing happened financially or whether then there was awareness of the nature of the practice that was going on. Yes, Your Honor. There is a diligence inquiry. There's also another step of once the individual plaintiff becomes aware of their claim, did they bring it within the two years? Our focus here, though, is only on the self-concealing nature of the claim. We don't discuss diligence here. But one thing that I would like to note that Emigrant has raised is this fact that the horrible interest rate when that imposed should have put the particular borrowers on alert. When you say, I'm sorry, I just was processing that. You're only talking about whether it's self-concealing but you're not addressing diligence. Is there any doctrine that law that we have that says self-concealing by itself gets you tolling without also considering diligence? No, Your Honor. And our position is that the self-concealing nature is not enough by itself to justify equitable tolling. But our position here is for the legal principles that apply generally across ACOA claims rather than the particular facts of an individual case. So I'm about self-concealing. The theory works with discovery? Or it's not something independent, you said? I'm just trying to figure out how it ties in. Yeah, the self-concealing aspect is part of the fraudulent concealment framework, which is itself part of the equitable tolling framework. But these are all different ways to really get at the same idea. Are there extraordinary circumstances present that would prevent an ordinary person from being able to know their cause of action? And here, there is simply no way that an individual borrower could have known that emigrant concentrated all of its marketing in black neighborhoods and in black newspapers. There's no way they could have known that their single default was part of a broad scheme built on defaults. And there was no way here they could have encountered similarly situated individuals. And all of those factors separate and together combine to make discriminatory targeting schemes generally, and this particular one here, capable of being equitably told. And I see I'm out of time, but if I could also briefly turn to the jury instructions. I would just like to note that emigrants seem to want to adopt a magic words test for the jury instructions. That if a single word is present or absent, that means this court should throw out a jury verdict that was reached after six weeks of trial and a decade of litigation. That's not the standard. The question here is whether the district court adequately informed the jury of the law and did not confuse the jury. And I'd also like to emphasize the point of animus here. That animus, as the district court used it, meaning hatred or ill will, is not part of a discrimination claim. That's clear if a bank decides not to give a credit card to a woman out of concern that women aren't capable of managing their finances. That's a discrimination claim, even if they didn't harbor ill will towards women. If they don't know that that was the reason, isn't that self-concealing in your framework? I'm sorry, can you repeat the question? Why wouldn't that be self-concealing? Oh, that particular hypothetical? Yeah, yeah, what you just mentioned. Unless they say, I'm not giving this to you because I'm discriminating against women, why wouldn't that be self-concealing? They wouldn't have a way to know it. Of course, discrimination very often occurs behind the scenes. And if it's out in the open, then it would likely end. But the fact is that it's going to depend on any particular case and the facts presented. The plaintiffs are going to have to demonstrate that equitable tolling applies. I'm going back. We say in our Title VII cases that it's rare these days when there's an outward expression of discriminatory intent. And this self-concealing doctrine that you're advocating for seems to turn that on its head and say, as a result, the clock does not start. Or there is no obligation to due diligence because it is self-concealing. And I just don't understand how that would work in practice in other contexts. Yeah, and we're not arguing that this framework should apply to every discrimination claim. And in a separate case, maybe the plaintiffs could demonstrate it. But what we're looking at is the- How do we decide which case it applies to? Again, the court can look at how it held its decision in Hendrickson Brothers or Veltri. In Hendrickson Brothers, for example, the court said that passing off a fraudulent item as one purporting to be genuine is self-concealing. And that the particular case there fit that framework. It wasn't saying that every bid rigging scheme or every conspiracy was going to be self-concealing. So too here. This court could simply recognize that discriminatory targeting claims are essentially passing off a predatory product targeted to black people as one that is genuine and available to all people equally. And that is the self-concealing nature. But the court can simply confine it to this particular case and say the district court did not abuse its discretion in finding that this claim was capable of being equitably told. Okay. Thank you, Your Honor. Thank you. Counsel is correct that this court's decision say that equitable tolling should only be used in extraordinary circumstances. But she is incorrect when she said that the factual findings here justified equitable tolling. There were no factual findings here. That is one of our complaints. Instead, the district court simply said that all housing discrimination claims are inherently self-concealing. And based off of that novel rule of law that the district court did not follow from this court or the Supreme Court decided that the claims in this case should be told. And we just heard from counsel also that the self-concealing nature of a claim is insufficient in and of itself to grant equitable tolling. All of these things, when you come together, create a significant problem. If there's going to be a rule of law that housing discrimination claims are inherently self-concealing, then we effectively have either a no or a very limited statute of limitations. Linda Commodore here brought her claims ten years after the closing and about nine and three quarters years after she defaulted and was told that she was going to have an 18% loan. Mr. Howell was about six years. Mr. and Mrs. Santil, five years. These are way outside the statute of limitations, either the two years under the federal or the three years under the state. Was there a latches defense raised here? We heard about that as one of the ways to sort of limit this concept. Was there an inequitable defense around that? No. We just raised the statute of limitations argument, Your Honor. And we frankly never got a ruling on the facts. We never got a hearing. We never got any of the things that this court has said we're supposed to get. The argument that we kind of heard a little bit here, which is, again, trying to change that, well, you wouldn't know just because you're of a certain race that you got a different rate on your loans. That's not what we're talking about here. We're not talking about if somebody goes and gets a mortgage and they find out that their friend got a quarter point better on the mortgage. What we're talking about here are situations where people experience, quote unquote, payment shock because they felt that they were defrauded as the rates that they would have to pay. That was the testament. And once that happens, you have an obligation to investigate and to be diligent about your claims. That's not what occurred here. That's why these claims were brought 10, 6, 8 years after the actual injury occurred. They can't separate out the idea, well, you had to know about the actual racial aspect of it because the Supreme Court and this court have been very clear. You don't need to know all of the elements of your claims. You just need to know that you were injured and that you have some kind of a legal basis for seeking out and being diligent about those claims. Had they done so? Had they gone to counsel? Maybe they would have had a better argument, but they didn't. And while the facts of the actual mortgage closings, the signings, are disputed, right? There are disputes about signatures, about brokers, about lawyers. We think all of those were clearly put to bed at the trial. But while there are disputes there, there is no dispute that once these borrowers defaulted on their loans, that they received notices, that they had an 18 percent interest rate, that they needed to pay that, that they felt that they were defrauded in that situation, and that they didn't timely go to counsel, and that after that, there's no evidence, none put together at trial, none cited in the appellate briefs, that Emigrant did anything to stop these borrowers from discovering their claims, stop them from going to lawyers, stop them from looking into it. So we think that this case, not just, we think that this panel obviously could reverse and send back for factual findings on this, but we think that the complete lack of evidence for equitable tolling after the mortgage default notices came, and the 18 percent came, and the shock payment came, should require a reverse on this particular situation. As to the instructions, just very, very clearly, it's not that Emigrant requires magic words, or we think that there should be magic words required for a jury instruction. Disproportionality is the key element of a disparate impact claim. In inclusive communities, the Supreme Court said, look, we have a lot of problems with disparate impact claims. We need to make sure that if they are going to be pursued under the Housing Act, that they need to be done in a circumscribed manner. Disproportionality is the key aspect of that. Thank you. Thank you, counsel. Thank you all. We'll take the case under advisory.